765 F.Supp. 551 (1991)
Marvin MUELLER, Plaintiff,
v.
James ABDNOR, Administrator of the Small Business Administration, Defendant.
No. 87-1965C(6).
United States District Court, E.D. Missouri.
May 29, 1991.
*552 *553 James C. Owen, Buechner, McCarthy, Leonard, Kaemmerer, Owen & Laderman, Chesterfield, Mo., for plaintiff.
Joseph B. Moore, Henry J. Fredericks, Asst. U.S. Atty., for Abdnor.
Jeremiah Phelan, Phelan & Potter, St. Louis, Mo., for Rissmann.
Claire Schenk, Chief Counsel for Claims & Inv. Co., U.S. Small Business Admin., St. Louis, Mo.

MEMORANDUM OPINION
GUNN, District Judge.
This is an action for breach of contract arising from a written agreement entered into by plaintiff Marvin Mueller (Mueller) and the Small Business Administration (SBA). Defendant James Abdnor is the current administrator of the United States Small Business Administration. Mueller alleges that the agreement was intended to convey two parcels of property located in Miller County, Missouri and known as the Manco property. Plaintiff seeks damages against the SBA for lost profits and incidental damages arising from the SBA's failure to convey the aforementioned real estate.
The SBA contends, in the alternative, (1) that Mueller failed to satisfy the terms of the contract and thus relieved the SBA of any obligation of performance, (2) that the contract was void due to mutual mistake, and (3) that there was no meeting of the minds concerning the identity of the property to be conveyed. The SBA has counterclaimed against Mueller for slander of title, alleging that Mueller's filing of an invalid contract with the Miller County Recorder of Deeds placed a cloud on the title and prevented the SBA from selling the property to a prospective buyer.
The SBA has also filed a third-party complaint against Jeffrey B. Rissman (Rissman). The SBA alleges that Rissman, in his capacity as a notary public, certified that Mueller signed a contract in his presence although the contract had been executed one year earlier and Rissman had not observed the execution. The SBA further alleges that as a result of Rissman's improper certification Mueller was able to record the contract with the Miller County Recorder of Deeds and thus prevent the SBA from selling the property.
Defendant James Abdnor contends that Mueller, by failing to tender the earnest deposit, failed to satisfy a material condition precedent to defendant's performance under the contract. In response plaintiff asserts that his failure to tender the earnest deposit is excused by defendant's extension of the contract "for possession." Alternatively, plaintiff asserts that the SBA's failure to inform him of the expiration of the contract and its acceptance of certain payments on the contract bars the SBA from rescinding its alleged agreement to sell him the properties.
This matter was tried to the Court sitting without a jury. The Court having duly considered the pleadings, memoranda, trial briefs, exhibits, and deposition testimony on file now makes the following findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

Findings of Fact
1. Plaintiff Marvin Mueller is an individual and resident of St. Louis, Missouri.
2. Defendant James Abdnor is the current Administrator of the United States Small Business Administration (SBA), an agency of the United States Government.
3. Third-party defendant Jeffrey Rissman is an individual and resident of St. Louis who has served as a notary public in the course of his employment by a corporation engaged in liquidation activities.
4. The parties called the following witnesses.
a. Cornelius Weaver, a Liquidation Loan Officer who handled the Manco properties for the SBA during the time relevant to this litigation.
b. Darryl Westbrook, a Supervisory Loan Specialist with the St. Louis district office of the SBA and Mr. Weaver's supervisor.
c. Maureen Brinkley, a Liquidation Loan Officer in the St. Louis district *554 office of the SBA during the time relevant to this litigation.
d. Marvin Mueller, the plaintiff.
e. Max Biernbawm, a Certified Public Accountant who prepared Mr. Mueller's tax returns.
f. Elaine Mueller, Mr. Mueller's wife.
g. Pat Roche, a Loan Servicing Assistant in the liquidation division of the SBA.
h. Ivan Schenberg, District Counsel for the St. Louis district office of the SBA.
i. Jeffrey Rissman, third-party defendant.
5. On or about December 30, 1977, the SBA agreed to guarantee a loan to a corporation known as Manco, Inc. (Manco). The loan was secured by a First Deed of Trust on approximately 52 acres of real estate at the junction of U.S. Highway 54 and Missouri Highway 52, Miller County, Missouri (the large parcel). The loan also was secured by the personal guaranty of Max Allen Nickerson and Carolyn Nickerson which in turn was secured by a First Deed of Trust on approximately 22 acres of real estate commonly known as the Max Allen Zoo (the small parcel).
6. Manco defaulted on the loan and the SBA purchased the guaranteed portion of the loan. Manco's delinquency persisted and on or about April 24, 1984, the SBA transferred the loan to liquidation status so that it could proceed to recover against the Manco loan collateral. Tr. 318, Westbrook Exh. 3-1.
7. In order to evaluate the worth of the its interest in the large and small parcels of real estate, the SBA obtained several appraisals of the properties. On June 7, 1985, James A. Hendren (Hendren) determined that the large parcel possessed a fair market value of $293,250. Hendren also ascertained that the small parcel possessed a fair market value of $66,000. Joint Stipulation of Facts, ¶ 3.
8. On June 28, 1986, Joyce Hilton (Hilton) performed a second appraisal on the properties. Hilton determined that the fair market value of the large parcel was $140,297. Hilton appraised the small parcel at a fair market value of $19,400. Exh. N, Joint Stipulation of Facts, ¶ 4. Prior to preparing her report, Hilton orally advised Weaver of her opinion concerning the value of the property. Tr. 123-25 (Weaver). Subsequently, on April 22, 1987, Hilton appraised the small parcel at a fair market value of $19,400. Exhibit N; Joint Stipulation of Facts, ¶ 4.
9. On or about January 22, 1986, the SBA decided to foreclose against the large parcel. This decision was documented in an SBA Form 327, a form which is utilized to document agency actions and to gain the necessary approval signatures. Exhibit 3-7. The Form 327 authorizing foreclosure referred to a 52-acre lot which corresponds to the large parcel but listed an appraisal value of $66,000.00 which corresponds to the Hendren appraisal of the small parcel.
10. Early in the summer of 1986 Cornelius Weaver visited Mueller and asked him whether he would be interested in purchasing certain properties which the SBA had for sale. The Manco property was included among those listed for sale. Shortly thereafter Mueller visited the property. Mueller testified that during this visit, he noted that the property was still functioning as a zoo and that animals remained on the premises. Mueller also observed that the property consisted of two non-adjacent parcels of land. Mueller testified that upon visiting the property and examining the smaller of the parcels, he had determined that the small parcel was without value. Tr. 274 (Mueller).
11. On July 7, 1986, the SBA foreclosed on the large parcel of land and purchased it for $275,000. Exhs. I & J; Tr. 322-23 (Westbrook); Joint Stipulation of Facts, ¶ 5. Prior to the sale, Weaver telephoned the trustee and instructed him to place a protective bid of $275,000. Tr. 48 (Weaver). Weaver failed to follow the normal practice of the SBA, which is to obtain authorization for a protective bid of a certain dollar amount and to record that authorization in a Form 327. Weaver testified that the $275,000 protective bid was based upon the Hendren appraisal rather *555 than the Hilton appraisal. He further testified that he believed Hendren's valuations to be customarily high. Tr. 117 (Weaver). Weaver did not visit the property, personally review the Manco loan collateral to determine its value or attend the sale. Tr. 117-20 (Weaver).
12. At some point after the July 7, 1986 foreclosure sale, Weaver reviewed the affidavit of publication relating to the sale and realized that the SBA did not own the small parcel of the Manco property because it had not been listed in the affidavit.
13. The SBA's standard policies and procedures require public sale of collateral upon which the SBA has foreclosed. Tr. 324 (Westbrook). Pursuant to this policy, a public sale of the Manco property was held on August 7, 1986. Prior to the public sale, Weaver prepared an advertisement concerning the sale and placed it in the St. Louis Post-Dispatch. Exh. ZZ. Westbrook did not review the advertisement prior to its publication. Tr. 327-28 (Westbrook); Tr. 127 (Weaver).
14. No prospective buyers attended the August 7, 1986 public sale of the Manco properties. Thereafter, Weaver informed Westbrook that he had located one interested purchaser, Mueller. Weaver recommended to Westbrook that the SBA sell the property to Mueller for $115,000. Tr. 48, 129-30 (Weaver). In response to Westbrook's request for an appraisal justifying the sale price of $115,000, Weaver produced the Hilton appraisal which valued the large parcel at $140,000. Exh. 8, Tr. 332 (Westbrook).
15. On or about August 7, 1986 Westbrook signed a contract for the sale of certain real property to Mueller for $115,000. The contract called for the "legal description to govern" the subject of the sale. In the area designated for the description of the property, the contract contained the notation "AKA Max Allen's Zoo." The Court finds that there were no attachments to the contract relating to the legal description of the property to be conveyed.
16. Westbrook testified and the Court finds that he signed the contract with the understanding that it related only to the large parcel, because Weaver had provided Westbrook with the Hilton appraisal relating to the large parcel. Tr. 334 (Westbrook). Mueller believed that the contract related to both parcels of land. Tr. 281 (Mueller).
17. SBA policy requires that the SBA must first obtain an offer to purchase before a contract is signed on its behalf. Tr. 335 (Westbrook). Westbrook testified that he has never signed a contract prior to obtaining the signature of the prospective purchaser. Tr. 335 (Westbrook). The Court finds that the contract had been signed by Mueller at the time that it was signed by Westbrook.
18. The contract called for a $5,000 earnest deposit receipt of which was acknowledged by the contract. The Court finds that Westbrook's testimony that there was no check attached to the contract at the time that he signed the contract does not negate the existence of the check inasmuch as SBA policy requires that checks be kept by the SBA's cashier. Tr. 334 (Westbrook).
19. The contract further called for an additional deposit of $15,000.00 by September 9, 1986 and the balance of $95,000.00 on closing which was set for October 10, 1986.
20. Plaintiff testified that in late July, 1986 he tendered a five thousand dollar check to the SBA as an earnest deposit for the August 7, 1986 contract. Tr. 226 (Mueller). This check has never been cashed and was not returned to the plaintiff. Id. Plaintiff's bank records for the period from July 18, 1986 through July 31, 1986 reflect a single missing check, No. 13648. Plaintiff's Exh. 35. In addition, plaintiff's accountant's check ledger for real estate expenditures during 1986 shows a $5,000.00 expenditure during the same time period. Plaintiff's Exh. 36. The Court finds that the $5,000 initial earnest deposit was made by the plaintiff but was not cashed by the SBA. Tr. 260-61 (Mueller).
21. Although the August 7, 1986 contract called for payment of $15,000.00 in *556 additional earnest money before September 9, 1986, Mueller did not tender the moneys on that date. Tr. 230 (Mueller); Exh. K.
22. Mueller testified that he did not tender the additional earnest deposit on September 9, 1986 because he had been informed by Weaver that the SBA had not foreclosed on, and therefore did not have title to the smaller parcel. Tr. 233 (Mueller).
23. At some point after Westbrook signed the contract, Weaver inserted and initialed the phrase "extended for possession" onto the contract. This extension was not authorized by Westbrook nor was it made pursuant to SBA policy which requires a prospective purchaser to make a written request for an extension of time. Tr. 12 (Weaver). Westbrook testified that he did not authorize an extension of the contract for possession. Tr. 335 (Westbrook). Weaver's testimony to the contrary was not credible. Tr. 61-62 (Weaver). In addition, there are no Form 327s authorizing the purported extension of the contract date. See Defendant's Exh. 18.
24. The Court finds that at some point between September 9, 1986 and March 23, 1987 Westbrook instructed Weaver to inform Mueller that the contract had expired due to lack of payment of the earnest money. Tr. 336 (Westbrook).
25. During late 1986 and the first half of 1987, Mueller expended roughly $1,000 in the upkeep and maintenance of the Manco property. Tr. 235-36. Mueller expended these funds in reliance upon Weaver's representations that the parties had a contract which had not expired.
26. On March 23, 1987 a $10,000 check signed by Mueller was applied to the Manco account. Exh. 11. Westbrook learned of this payment but did not order the return of the check because the SBA coding placed on the check by Weaver indicated that the payment was for a purchase of assets acquired by the SBA rather than an earnest money deposit. Tr. 337-38 (Westbrook); Exh. B. There was no evidence that Westbrook authorized or approved of Weaver's alleged acceptance of this check as a payment on the August 1986 real estate contract. Mueller failed to establish that this payment was made as an earnest deposit toward the purchase of real estate rather than collateral. The SBA has failed to establish that these moneys were properly retained by it as payment for the purchase of assets other than real estate. Tr. 337-38 (Westbrook).
27. On or about April 10, 1987 the SBA applied to the Grus Custom Meats (Grus) account a $10,000.00 check signed by Mueller and dated December 31, 1986. The check was not presented for payment until April 4, 1987 at which time it was refused for insufficient funds. Tr. 239 (Mueller). When the check was returned to Mueller after payment had been refused, he inserted the notation "Manco, Lake of the Ozarks" in the lower left hand corner of the check. Tr. 239-40 (Mueller).
Plaintiff had purchased the Grus property from the SBA on August 13, 1986 for $27,500 in exchange for a down payment of $2,500 and a note for $25,000. The first payment on the note came due in February of 1987. Tr. 255-56 (Mueller); Exh. 23 p. 2. Plaintiff sold the property to a third party on September 30, 1986 for $70,000. Exh. 23 p. 2. Plaintiff testified that he directed $25,000 from the proceeds of the sale to the SBA to pay off the loan. Tr. 238 (Mueller). See also Exh. 23 p. 2. SBA records indicate that a check for $22,078.98 from the proceeds of the sale was received by the SBA on October 3, 1986. Tr. 174 (Brinkley); Exhs. 30-33. However, in September 1986 Westbrook released the deed of trust securing the $25,000 Grus loan. Exh. 24; Tr. 335 (Westbrook). Maureen Brinkley, acting as the Supervisory Loan Specialist in Westbrook's stead, signed a SBA Collateral Purchase Report (CULPUR) acknowledging the SBA's receipt of full payment on the $25,000 loan. Exh. 23; Tr. 175-76 (Brinkley).
The SBA first contacted Mueller concerning moneys allegedly owing on the Grus account in August of 1987 after plaintiff initiated this litigation. Exhs. 30-33; Tr. 174-75 (Brinkley). The amounts sought by the SBA varied inexplicably and the amount sought, roughly $3,000, in no way *557 correlated to the $10,000 ultimately applied to the Grus account. The Court finds insufficient evidence to support the SBA's application of the $1,000 check to the Grus Account.
The Court also rejects Mueller's assertion that the check should have been applied as an additional earnest deposit on the Manco property. There was no credible evidence indicating that Weaver had the authority to accept additional earnest money toward the purchase of the property in December 1986 or April of 1987.
28. On or about June 30, 1987 Mueller submitted a second contract for the purchase of the large parcel. Exh. O. The terms of this offer included $15,000 to be paid with the contract; $5,000 by July 7, 1987; $10,000 to be paid at closing; and a note for $85,000 payable at 10 percent for 10 years.
29. On July 9, 1987 the Manco account was reassigned from Weaver to SBA loan officer, Barry Jackson. On July 22, 1987, Weaver gave Jackson a $10,000 check signed by Mueller and dated August 15, 1987.
30. On July 22, 1987 Westbrook sent Mueller a letter rejecting Mueller's June 30, 1987 contract. Exh. 28, Q-1. Later that day, when Westbrook became aware of the $10,000 postdated check, he prepared another letter returning the check to Mueller. Exh. 29, Q-2.
31. On August 19, 1987 Mueller filed the August 7, 1986 contract with the Miller County Recorder of Deeds. Prior to filing the contract, Mueller was informed by the recorder of deeds in Clayton, Missouri that the contract could not be filed unless it was notarized. Tr. 280 (Mueller).
32. On August 18, 1987 Mueller approached Rissman and asked him to notarize the contract. Mueller informed Rissman that he needed the notarization for his attorney's files and to make something proper. When Rissman noticed that the contract was dated approximately one year prior, he told Mueller that he did not want to notarize the contract. Mueller persisted in his request and Rissman ultimately agreed to notarize the contract after examining Mueller's driver's license and requiring him to provide a sample of his signature for comparison. Rissman placed the phrase "signed and sworn before me this 18th day of August, 1987" on the contract. Tr. 444-47 (Rissman).
33. The Court finds that Mueller had been notified of the expiration of the August 7, 1986 contract prior to the time that he presented it for filing to the Miller County Recorder of Deeds. Tr. 246, 280 (Mueller). Mueller's second offer to purchase the property as well as his postdated check also had been rejected by the SBA when Mueller presented the August 7, 1986 contract for filing. See Findings of Fact at 30, supra.
34. On August 17, 1987 the SBA decided to foreclose upon the small parcel. Exh. S-2; Tr. 346. Prior to the foreclosure sale, Jackson recommended and the SBA approved a protective bid in the amount of $14,000. The property was purchased by Sherm Ketchum at the sale for $14,000. Tr. 348-49 (Westbrook).
35. On August 27, 1987 following an offering of the large parcel at an auction sale, the SBA entered into a contract for the sale of the parcel to an individual named Jack Jordan. The sale price of the property was $238,000. Exh. U. Although the SBA twice extended the contract pursuant to written request, the contract did not close. In the title insurance policy issued to the prospective purchaser, the August 7, 1986 contract was listed as an exception. Tr. 204-05; Exhs. W, X, Y, Z & AA.
36. The Court finds that the Jordan contract failed to close because of the filing of the August 7, 1986 contract with the Miller County Recorder of Deeds. Tr. 200, 204-05 (Westbrook); Exhs. W, X, Y, Z & AA.
37. Weaver resigned from his position with the SBA on August 28, 1987 after Westbrook discovered and questioned him concerning numerous irregularities in the accounts to which he had been assigned. Tr. 354 (Westbrook). After Weaver's departure from the SBA, Westbrook discovered a blank sales contract in Weaver's desk. The sales contract had been signed by *558 Mueller. Tr. 354-55 (Westbrook); Exh. AAA.
38. On August 29, 1989 the SBA effected a sale of the large parcel for $193,000. Exh. BBB. Due to the failure of the Jordan contract to close and the SBA's continued possession of the large parcel until August 29, 1989, the SBA incurred the following Losses: 1) $45,000, the difference in the sale prices; 2) $47,600, two years' interest on $238,000 at a rate of ten percent; 3) $6,256, advertising for the August 29, 1989 sale; and 4) $496, maintenance of the property; $500, the no-sale fee on the Jordan sale; $307.50, fifty percent of the survey costs associated with the second sale. Tr. 205-06 (Westbrook); Exhs. EEE & FFF. The SBA expended $6,256 in advertising prior to this sale. Tr. 205-06 (Westbrook); Exhs. EEE & FFF.

Conclusions of Law
1. The Court has jurisdiction over plaintiff's claim pursuant to 15 U.S.C. § 634(b)(1) and over defendant's cross-claim pursuant to 28 U.S.C. §§ 1331 and 1345.
2. Venue is proper in the Eastern District of Missouri pursuant to 28 U.S.C. § 1391(e).
3. The Court concludes that there was no meeting of the minds with respect to the August 7, 1986 contract, because the parties failed to reach an agreement concerning the identity of the land to be conveyed. Mueller believed that he was purchasing two parcels of land and Westbrook believed that the SBA was selling one parcel of land. See Findings of Fact at ¶ 16. Accordingly, there was no valid contract between the parties for the sale of either property. See Hopper Furs, Inc. v. Emery Air Freight Corp., 749 F.2d 1261, 1264 (8th Cir.1984); Randall v. Harmon, 761 S.W.2d 278, 280 (Mo.Ct.App.1988).
4. The Court further concludes that Weaver's purported extension of the contract for possession is not binding upon the SBA because the extension was accomplished without Westbrook's knowledge or approval. Urban Data Systems v. United States, 699 F.2d 1147, 1153-54 (Fed.Cir. 1983); DeVilbiss v. SBA, 661 F.2d 716, 718 (8th Cir.1981); Greenwald v. Olsen, 583 F.Supp. 1002, 1009 (D.Mass.1984) (United States not bound by the unauthorized acts or representations of its employees when they act beyond the scope of their authority). See also Federal Crop Ins. Corp. v. Merrill, 332 U.S. 380, 384, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947) (anyone entering into an arrangement with the government assumes the risk that the government agent will act within the limits of his authority).
5. The purported extension for possession also would have rendered the alleged agreement invalid by failing to reflect agreement concerning dates for the payment of earnest money. Hopper Furs, Inc. v. Emery Air Freight Corp., 749 F.2d 1261 (8th Cir.1984).
6. Even if a contract had been formed on August 7, 1986 the Court concludes that the SBA would not have waived its right to rescind the contract by failing to immediately inform Mueller of the expiration of the contract. Westbrook directed Weaver to so inform Mueller, but Weaver failed to follow this directive until at least June or July of 1987. See Tr. 336 (Westbrook); Tr. 246 (Mueller). A waiver and estoppel cannot arise from Weaver's unauthorized representations to Mueller that the contract was still in force because such unauthorized representations are not binding upon the United States. See DeVilbiss v. SBA, 661 F.2d at 718.
Plaintiff also contends that a waiver and estoppel arose as a result of the SBA's acceptance of a $5,000 payment on March 23, 1987. In light of the Court's conclusion that there was insufficient evidence to establish the existence of a binding agreement between the parties based upon the August 7, 1986 contract, the SBA's acceptance of this payment does not give rise to such an agreement. Moreover, in the absence of evidence that Westbrook authorized Weaver's acceptance of the check for this purpose, the Court concludes that the SBA cannot be bound by Weaver's acceptance of the payment. See DeVilbiss v. SBA, 661 F.2d at 718.
*559 7. The Court further concludes that plaintiff's claim for breach of contract must also fail because plaintiff failed to sustain his burden of proof on the issue of lost profits. Plaintiff seeks $144,000 in lost profits but offered no evidence that he had ever obtained a commitment from a prospective purchaser. The Court concludes that plaintiff's proof of lost profits is too speculative to sustain an award of damages. Vigano v. Wylain, Inc., 633 F.2d 522, 528 (8th Cir.1980) (requiring claims for lost profits to be proved with reasonable certainty).
8. Although plaintiff has failed to sustain his burden of proof concerning the mutual assent and damages element of his breach of contract claim, the Court concludes that plaintiff is entitled to recover damages on the basis of promissory estoppel. See Heckler v. Community Health Services, 467 U.S. 51, 60-61, 104 S.Ct. 2218, 2224-25, 81 L.Ed.2d 42, 52-53 (1984). Plaintiff reasonably relied upon the representations of the SBA's agent, Weaver, when he expended $1,000 to maintain the property. Plaintiff's reliance on Weaver's representations further led him to make $15,000 in payments to the SBA. He therefore suffered a "detrimental change in position" as a result of his reliance on Weaver's representations. Heckler, 467 U.S. at 61-62, 104 S.Ct. at 2224-25. Plaintiff's reliance was reasonable in light of his long-standing business relationship with Weaver. Moreover, the SBA failed to demonstrate that it properly directed the $15,000 in payments to the Grus Custom Meats Account or to a purchase of non-real estate assets. In the absence of such proof, the SBA may not retain these moneys. State Auto. & Casualty Underwriters v. Johnson, 766 S.W.2d 113, 125 (Mo.Ct.App.1989) (allowing recovery to avoid unjust enrichment). Accordingly, plaintiff is entitled to recover $16,000 in damages corresponding to the funds he expended in reliance on the representations of Weaver.
9. In order to prevail on its counterclaim against Mueller for slander of title, the SBA must demonstrate 1) the falsity of the document filed; 2) malicious publication of the document; and 3) resulting pecuniary loss. See Connaway v. Walters, 786 S.W.2d 913, 917-18 (Mo.Ct.App.1990) (quoting Tongay v. Franklin County Mercantile Bank, 735 S.W.2d 766, 770 (Mo.Ct. App.1987)). Whether the document which Mueller presented to the recorder of deeds was in the proper form for filing is irrelevant to the slander of title claim. "It is not a question of whether the [document] is technically effective, but whether it would have the effect of creating a cloud on the title and would be a hindrance in the transfer of the property." Sanders v. Pete & Sons Garage, Inc., 769 S.W.2d 844, 845 (Mo.Ct.App.1989).
The SBA, as counterclaimant, bears the burden of establishing the existence of each of the elements in its claim of slander of title. Connaway, 786 S.W.2d at 918 (citing Chandler v. New Moon Homes, Inc., 418 S.W.2d 130, 135 (Mo.1967) (en banc); Show-Me Restoration Services v. Harlan, 778 S.W.2d 350, 351 (Mo.Ct.App. 1989)).
10. On the basis of the facts set forth in Findings of Fact Nos. 32 & 33, supra, the Court concludes that Mueller knew at the time that he filed the August 7, 1986 contract that it had expired and was therefore false. The Court further concludes that Mueller acted maliciously when he presented for filing a contract which the SBA as offeree had denominated as stale and ineffective. See Findings of Fact at 33, supra; Euge v. Golden, 551 S.W.2d 928, 930 (Mo.Ct.App.1977); Greenlake Inv. Co. v. Swarthout, 161 S.W.2d 697, 699 (Mo.Ct.App.1942).
11. The Court further concludes that the SBA has demonstrated by a preponderance of the evidence that the filing of the contract placed a cloud upon its title and that the Jordan sale failed to close as a result of the filing of the August 7, 1986 contract. See Findings of Fact at ¶ 33 & 36, supra. Therefore the SBA has established the resulting pecuniary loss element of its claim.
Having established each of the elements of its slander of title counterclaim, the SBA is entitled to recover the $100,159.50 damages *560 flowing therefrom. See Findings of Fact at No. 38, supra for itemization of damages.
12. Pursuant to Missouri law, a notary public is liable for all damages proximately caused by his or her official misconduct. Mo.Ann.Stat. § 486.355 (Vernon 1987). Liability may be assessed against a notary public even if the alleged official misconduct is not the sole proximate cause of the injury sustained. Mo.Ann.Stat. § 486.365 (Vernon 1987).
13. The language affixed to the August 7, 1986 contract by the notary, Rissman, was an affirmation rather than an acknowledgement. Compare Mo.Ann.Stat. § 486.335(1) (Vernon 1987) with Mo.Ann. Stat. § 486.330(1) (Vernon 1987).
14. The Court concludes that Mueller induced Rissman to affirm the August 7, 1986 contract. By virtue of Mueller's wrongful inducement, the Court concludes that Rissman's actions were only deminimis in the events leading to the slander of the SBA's title. The Court concludes, therefore, that Rissman's action was not a proximate cause of the injury suffered by the SBA. Accordingly, there is no basis under Mo.Ann.Stat. § 486.355 to assess liability against Rissman.

JUDGMENT
This action was tried before the Court, sitting without a jury, and a decision having been duly rendered pursuant to the memorandum opinion filed on this date herein,
IT IS HEREBY ORDERED, ADJUDGED and DECREED that the plaintiff Marvin Mueller recover of the defendant James Abdnor the sum of $16,000, with interest thereon at the applicable rate as provided by law.
IT IS FURTHER ORDERED, ADJUDGED and DECREED that the counterclaimant James Abdnor shall recover of the counterclaim defendant Marvin Mueller the sum of $100,159.50 with interest thereon at the applicable rate as provided by law.
IT IS FURTHER ORDERED, ADJUDGED and DECREED that the crossclaimant James Abdnor take nothing on his crossclaim against crossclaim defendant Jeffrey Rissman, that the crossclaim be dismissed on the merits.